# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Proceedings |
| | ) | |
| **LEGACY CARES, INC.,** | ) | Case No: 2:23-bk-02832-DPC |
| | ) | |
| Debtor. | ) | **UNDER ADVISEMENT ORDER** |
| | ) | **RE CONTESTED MATTER** |
| | ) | **INVOLVING OKLAND** |
| | ) | **CONSTRUCTION COMPANY, INC.** |
| | ) | **AND KEARNEY ELECTRIC, INC.**[1] |
| | ) | |
| | ) | (Not for Publication – Electronic |
| | ) | Docketing ONLY) |
| | ) | |
| | ) | |

Legacy Cares, Inc. ("Debtor" or "Legacy") filed its chapter 11 bankruptcy when it could not pay its bills, especially amounts it owed to the construction companies who built its sports complex and to the bondholders that financed most of that construction. After the sports complex was sold during Debtor's chapter 11 case, there remains a dispute between the general contractor, Okland Construction Company, Inc. ("Okland"), and the electrical subcontractor, Kearney Electric, Inc. ("Kearney"), over the sum of up to $471,685 plus interest, costs and attorneys' fees. This Court now largely resolves this dispute in favor of Kearney.

---

[1] This decision sets forth the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

## I.     BACKGROUND

### A.     Overview

Legacy is an Arizona not-for-profit corporation formed to build a 320-acre sports and entertainment complex heralded as the Legacy Family Sports Entertainment Park[2] (the "Sports Park") located in Mesa, Arizona. Legacy obtained Arizona Industrial Development Authority ("IDA") bonds issued to make a developmental loan in the original principal amount of $250,770,000.[3] Legacy entered into a 40-year ground lease with Pacific Proving, LLC ("Pacific" or "Landlord") for land upon which the Sports Park was built.[4] Okland was eventually hired as the general contractor on this project.[5] Legacy directly hired Kearney to perform some of the electrical work at the Sports Park but the bulk of Kearney's work was performed as the primary electrical subcontractor to Okland.

Ground was broken at the Sports Park in September 2020. Kearney's direct work for Legacy and its work through Okland were performed under great time pressure but all of Kearney's work was completed timely and satisfactorily. When the Sports Park finally held its grand opening on February 4, 2022, it featured 57 indoor volleyball courts, 8 baseball and softball fields, 19 indoor basketball courts, 35 soccer, football and lacrosse fields, 41 pickleball courts (including one stadium court under a huge shade structure), a 25-acre festival space, a 2.7-acre "Great Lawn," a 3,000-seat outdoor stadium, a 2,800-seat arena and a 17,000 square foot bar and restaurant named "GOAT."[6] Concessions are sprinkled throughout the Sports Park.[7]

The Sports Park was opened well after its originally scheduled completion date, causing Legacy to lose significant projected income. The Covid pandemic did not help

---

[2] See Trial Exhibit ("Ex.") 2.
[3] Administrative File Docket Entry ("DE") 3, p. 10, ¶ 16–17.
[4] DE 9, p. 3, ¶ 6.
[5] The original general contractor was JS Waltz Construction, LLC. Waltz was terminated in October 2020, and replaced by Okland. See 2:25-ap-00103-DPC (Adversary DE 1).
[6] DE 9, ¶¶ 3 and 4.
[7] Id.

matters nor did construction cost overruns.[8] Although Kearney had been paid about $13 million[9] before Debtor's bankruptcy, when Kearney finally completed its work in January 2022, it claimed to still be owed over $5 million. After all construction concluded, Okland claimed it was owed over $25 million.[10] By August 2022, Debtor defaulted on its payments due to UMB under the IDA bonds. Approximately 21 materialmen claimants filed liens aggregating about $37 million against the Sports Park.[11] Materialmen lien foreclosure actions were filed towards the end of 2022. Numerous other lawsuits and arbitration actions were filed.[12] Legacy filed its voluntary chapter 11 bankruptcy on May 1, 2023 ("Petition Date").

## B. Agreements Between Kearney and Okland

Kearney and Okland entered into an August 22, 2019 agreement entitled "Okland Construction Company, Inc. Master Subcontract Agreement" (the "Subcontract Agreement")[13] and a May 3, 2021 "Okland Construction Company, Inc. Work Order Pursuant to Master Subcontract Agreement" (the "Work Order").[14] To induce Kearney to mobilize at the Sports Park, Kearney was paid $853,000 when it signed the Work Order. Kearney refers to this as a payment for "mobilization only."[15] At that point, no aspect of the design of this project had been completed.[16] Almost all of Kearney's work

[8] *Id.* at ¶ 47. Beyond those difficulties, it has recently come to light that Legacy's principals, Randy Miller and his son, Chad Miller, pled guilty to "defrauding several of the nation's biggest investment firms about the business prospects of [Legacy] that wound up costing municipal bondholders more than $280 million." Chris Dolmetsch, *Sports Park Promoters Plead Guilty to $280 Million Bond Fraud*, BLOOMBERG BUSINESS WEEK (May 28, 2025, 10:29 AM), https://www.bloomberg.com/news/articles/2025-05-28/sports-park-promoters-plead-guilty-to-280-million-bond-fraud; *See also USA v. Miller*, 1:25-cr-00138-LAK, U.S. District Court, Southern District of New York, Docket May 28, 2025.
[9] According to Okland, prior to Debtor's bankruptcy, Okland received from Legacy and then paid to Kearney $12,936,856 for work Kearney performed through Okland. DE 894 at 1. Ex. 122 reflects Kearney as having been paid $13,038,708 through December 15, 2021.
[10] Okland's claim included those of all its subcontractors, including Kearney.
[11] *Supra* Note 4, ¶ 50.
[12] *Supra* Note 4, ¶¶ 52–54.
[13] Ex. 1.
[14] Ex. 2.
[15] DE 895, p. 4, l.6.
[16] DE 883, p. 115, ll. 20–24.

through Okland would be via change order requests ("COR's"). Okland referred to this project work arrangement as the "fast track delivery method"[17] which it says is a "tried and true method of accelerating the completion of a project."[18] As it turns out, by the time Kearney's work was completed at the Sports Park, there were 117 COR's issued by Kearney, 71 of which are at issue in this contested matter.[19]

### C.     Construction of the Sports Park

Although the groundbreaking ceremony for the Sports Park occurred in September 2020, Kearney's work through Okland began around the time it signed the May 31, 2021 Work Order.[20] That Work Order called for payment to Kearney of $853,000 to get started on what were at that time very vague construction requirements. What followed was a flurry of 52 Subcontract Supplements issued between June 16, 2021 and January 4, 2022.[21] A blizzard of COR's were issued between August 6, 2021, and June 15, 2022, of which 71 are now at issue.[22] Kearney also issued nine pay applications (the "Pay Applications") summarized as follows:

1. April 30, 2021, in the amount of $157,185.[23]

2. May 31, 2021, in the amount of $189,607.[24]

3. June 30, 2021, in the amount of $2,849,113 pertaining to Subcontract Supplement No. 1.[25]

4. July 31, 2021, in the amount of $2,646,466 pertaining to Subcontract Supplement Nos. 2 - 4.[26]

---

[17] DE 894, p. 4, ll. 12–26.
[18] Id. at l. 25.
[19] See DE 884, p. 149–150.
[20] Ex. 2. See n.5 above explaining that the original general contractor was replaced by Okland.
[21] These Subcontract Supplements are found at Ex's 115, 117–119, 123–146, 148–150 and 152–172.
[22] Ex. 3.
[23] Ex. 112.
[24] Ex. 113.
[25] Ex. 114.
[26] Ex. 116.

5. August 31, 2021, in the amount of $862,255.[27]

6. September 30, 2021, in the amount of $830,030.[28]

7. October 31, 2021, in the amount of $1,318,697 pertaining to Subcontract Supplement Nos. 5 - 28.[29]

8. November 30, 2021, in the amount of $609,725 pertaining to Subcontract Supplement Nos. 29 - 31.[30]

9. April 1, 2022, in the amount of $2,792,891 pertaining to Subcontract Supplement Nos. 32 - 52.[31]

Pay Applications 1 through 7 were fully paid by December 15, 2021, in the aggregate amount of $13,038,708.[32]

By the time Kearney finished its work at the Sports Park, it claims it was owed in excess of $5 million for both direct and indirect work done on the project. By January 2022, Okland knew Legacy did not have sufficient funding to satisfy all construction claims, including amounts claimed owing to Okland and Kearney. Okland finally submitted Kearney's bills to Legacy or its project manager, Marc Taylor, Inc. ("MTI"), in March 2022. MTI posed a number of questions regarding Kearney's final COR's. Those concerns were memorialized in red ink typed on Kearney's COR's. Up to that point on this project, neither Okland nor MTI nor Legacy had questioned any of Kearney's bills and Kearney had been paid over $13 million for its efforts without dispute.

The questions raised by MTI and/or Okland's Director of Finance after reviewing Kearney's final COR's including concerns over:

---

[27] Ex. 120.
[28] Ex. 121.
[29] Ex. 122.
[30] Ex. 147.
[31] Ex. 151.
[32] Ex. 122.

1. The regular $65/hour rate Kearney was charging for its personnel as well as the 1.5X overtime rate and the 2X holiday rate;

2. The number of hours Kearney charged for certain work;

3. Whether Kearney actually paid its electricians for the hours and rates Kearney was charging on this job;

4. The "General Conditions" Kearney built into its $65/hour rate, particularly the inclusion of certain insurance costs and what appeared to Okland to be additional charges for insurance costs over and above this built-up or composite hourly rate ($36,138 and $50,000)[33];

5. Holiday overtime on top of wages already paid ($103,564 and $40,870);[34]

6. Allegedly double charging certain "General Conditions" ($243,914);[35]

7. Trade damage ($25,520)[36]

8. Missing conduit and grinder pumps ($2,570 and $850, respectively).[37]

Okland's Rob Fisher ("Fisher") claimed to be working with MTI, Legacy and Kearney to answer these questions but testified that, since none of these issues were resolved, Kearney could not be paid all of these sums identified in Kearney's final COR's.

### D. Arizona Liens and Litigation

Prior to the Petition Date, Kearney recorded three mechanic's liens with the Maricopa County Recorder's Office on July 19, 2022, and on July 21, 2022.[38] Two of Kearney's materialmen liens pertained to its direct work for Legacy. The third lien was on account of Kearney's electrical work at the Sports Park via Kearney's subcontract

---

[33] Ex. 270
[34] DE 894, p. 19, ll. 23–24.
[35] Id at 18, l. 16.
[36] Id.
[37] Id.
[38] (1) Document No. 20220581676, which was re-recorded as Document No. 20220585986, (2) Document No. 20220588947, as amended at Document No. 20220610808, and (3) Document No. 20220582688, re-recorded at 20220586439 and amended as Document No. 20220651130 (collectively the "Kearney Liens"). See DE 782, ¶ 9.

with Okland.[39] Kearney (and many other materialmen) filed actions in the Arizona Superior Court, Maricopa County ("State Court") to foreclose their materialmen's liens. Kearney's State Court lawsuit was eventually consolidated into Case No. CV2022-013494 (the "State Court Foreclosure Action"). Before the State Court Foreclosure Action made a great deal of progress, Legacy filed its voluntary chapter 11 bankruptcy petition. The State Court Foreclosure Action was removed to this Court on May 23, 2023.[40]

Legacy's questions concerning Kearney's final billings were but a part of a much bigger problem with the Sports Park. In the Summer of 2022, Okland was claiming Legacy owed over $25 million to Okland and all its subcontractors, including the sums owed to Kearney. In an effort to resolve most of their differences, Okland and Legacy entered into a settlement agreement dated August 1, 2022.[41] That agreement generally called for mutual releases and a payment to Okland in the amount of $21 million plus a note in favor of Okland for $300,000. The agreement also called for recognition of February 11, 2022, as the "substantial completion" date on the Sports Park and further called for prompt issuance by Legacy of a certificate of occupancy. Neither Kearney nor any of Okland's subcontractors were parties to this agreement. Legacy failed to pay the initial $21 million which was due 72 hours after execution of the agreement. Notwithstanding Legacy's breach of this agreement, Okland never repudiated the agreement. Had Legacy actually timely performed, it appears Okland believed it did not need Kearney's consent. Okland and Kearney would have been left fighting over the $21.3 million, presumably with Okland contending it pegged Kearney's claim at $2.6 million as a part of its settlement with Legacy. But that is not what happened, and

---

[39] *See* DE 786, ¶ 4. Okland suggests that Kearney's lien claims were untimely. *See* DE 894, p. 25, l. 17.
[40] *See* DE 127; *See* Adversary Proceeding 2:23-ap-00089-DPC.
[41] *See* Ex. 184.

1  Kearney never agreed its claim was $2.6 million as of August 2022. Even at that time,

2  Kearney noted its indirect claim against Okland was over $3 million.

### E.    The Bankruptcy Proceedings

5      On the Petition Date, Debtor sought the Court's approval of debtor-in-possession

6  ("DIP") financing from its IDA bond creditors. UMB, as trustee of these IDA bonds,

7  proposed to provide DIP financing up to $9 million in hopes that the Debtor could find a

8  buyer for the Sports Park within the following months. It was believed by the Debtor and

9  UMB that, after the Petition Date, the Debtor would lose about $1 million/month

10  operating the Sports Park while the sale process pressed forward. Over stiff opposition,

11  the Court approved the proposed DIP financing.[42] The Court also approved the

12  employment of an investment banker to market the Sports Park.[43]

13      The Debtor had hoped the Sports Park would sell for an amount in excess of $100

14  million. Unfortunately, the Sports Park was ultimately sold for a tad over $25 million,[44]

15  an amount well short of (1) the $25 million plus in asserted materialmen's liens, (2) the

16  $300 million plus claimed owed to the bondholders and (3) millions more claimed by

17  trade creditors and lessors. From the sale proceeds, on account of its direct claims against

18  Legacy and the Sports Park, Kearney was paid $1,620,071 (75.14% of its claim in the

19  amount of $2,155,990). Okland was paid the sum of $15,129,271 (76.53% of its claim

20  asserted in the amount of $10,294,437 plus all the sub's indirect claims in stated principal

21  amounts totaling $9,473,975). Okland, in turn, paid Kearney $1,953,338,[45] an amount

22  which was 73.16% of what Okland's claims was Kearney's allowable claim of

---

[42] DE 69; DE 157; DE 216.
[43] DE 155.
[44] DE 622. Over $19 million paid by AZ Athletic Associates, LLC ("Buyer") and over $6 million was paid by the Landlord, Pacific.
[45] DE 895.

$2,669,955. Okland also was required to hold back an amount totaling $500,000 (the "Holdback") pending resolution of this contested matter.

After Legacy filed bankruptcy, Okland claimed it was owed $25,254,538.51.[46] Okland's claim included all claims of its subcontractors, including Kearney's unpaid claim asserted in the amount of $3,169,965. Kearney contended it was owed $2,155,990 by Legacy for work Kearney completed directly for Legacy (i.e. not via Kearney's work through Okland).[47]

On August 4, 2023, Legacy filed its sale motion and request for approval of bidding procedures ("Sale Motion")[48] but did so at a time that a purchaser had not yet been selected. On September 7, 2023, the Court entered its Order approving the sale bidding procedures ("Sale Procedures Order").[49]

On November 3, 2023, Legacy filed its "Notice of Terms and Conditions of Proposed Sale" (the "Sale Terms").[50] It was through this Sales Terms notice that Legacy finally revealed the identity of the Buyer of the Sports Park and the terms of a proposed asset purchase agreement.

Legacy, Okland, Kearney and others came back to the settlement table once an independent third party emerged as a possible purchaser[51] of the Sports Park. Legacy and Pacific were very anxious to close a sale but realistically could not do so without making peace with the bondholders (through UMB) and Okland, Kearney and the other subcontractors. Emails were exchanged by counsel for Kearney, Legacy and Pacific.[52] Legacy and Pacific eventually agreed Okland, Kearney and all other subcontractors were to be paid the collective sum of $19 million, or 75.14% of their stated claims, to resolve

---

[46] *See* Okland's Proof of Claim No. 36 filed on June 30, 2023, in the Debtor's bankruptcy case.
[47] *See* Kearney's Proof of Claim No. 25 filed on June 29, 2023, in the Debtor's bankruptcy case.
[48] DE 335.
[49] DE 453.
[50] DE 562.
[51] AZ Athletic Associates, LLC, defined above as Buyer.
[52] *See* Exs. 178–183.

all direct and indirect contractor claims. Kearney's direct and indirect claims were known by all to be asserted in the aggregate amount of $5,350,104.25.[53] Okland was not a party to Kearney's agreements with Legacy and Pacific.

Okland negotiated a Memorandum of Understanding (the "MOU") with the Buyer, Pacific, Legacy, UMB, and the subcontractors, including Kearney. Those parties also agreed to a form of sales order (the "Sale Order") to which the MOU was attached. At the November 20, 2025, hearing on the Sale Motion, Legacy's counsel advised the Court that Okland and Kearney were withdrawing their opposition to the Sale. Counsel for Kearney and Okland both advised the Court that the terms of their withdrawal were specified in the MOU which was to be attached to the Sale Order.[54] For its part, Kearney agreed to receive $1,620,071 on account of its direct claim against Legacy and the Sports Park.[55] Kearney and Okland also agreed in their "Joint Conditional Non-Opposition"[56] that "Okland, based on its records, asserts that Kearney's [indirect] lien claim amount totals $2,669,953 of which Okland intended to pay 73.16% as Kearney's pro rata share." Kearney did not agree with either the number unilaterally identified by Okland or the percentage Okland proposed to pay Kearney. The parties agreed the $500,000 Holdback would be held by either Okland or the sale escrow company, pending resolution of the contested matter which is the subject matter of this Under Advisement Order. The Sale Order was entered by the Court on November 22, 2023.[57]

The Sale Order directs what is to happen relative to this Okland-Kearney contested matter. Specifically, it states:

---

[53] Recall that Kearney's proof of claim filed in this bankruptcy was comprised of direct claims against Legacy ($2,155,990) and claims for Kearney's work performed through Legacy's prime contract with Okland ($3,169,965).
[54] *See* DE 616; *See also* DE 611 at 21:30 time mark.
[55] *See* Ex. 185 at 74. The Joint Conditional Non-Opposition on pages 1–2 states: "Kearney's agreement with Pacific Proving to release its liens and allow the proposed sale to move forward was subject to Kearney receiving a 75.14% return on each of its liens, including the $3,169,965 lien under Okland." DE 590, p. 1–2.
[56] DE 590, p. 2.
[57] DE 622; Ex. 185.

45. Notwithstanding the foregoing,

(i) Upon Closing, and subject to mutually agreeable instructions provided by Kearney Electric, Inc. ("**Kearney**") and Okland, $500,000 (the "**Holdback**") of the sale proceeds that are earmarked for Okland and Kearney on account of their respective lien claims shall be (a) distributed pursuant to Kearney's and Okland's joint instructions and, if no joint instructions are received, (b) held in escrow pending resolution of the dispute between Kearney and Okland.

(ii) The Holdback shall be funded from Okland' portion of the $15,129,271 payment scheduled to be made on account of the Okland ML Claimants.

(iii) The Holdback shall not impact the payments scheduled to be made to any other mechanic lienholder or stakeholder at Closing, nor shall it impact or reduce the payment Kearney shall receive at closing on account of (a) its direct lien of $2,155,990, and (b) the amount Kearney would receive if its lien claim under Okland is calculated at $2,669,953.

(iv) Prior to Closing, Kearney shall deposit in escrow a release of lien for its two mechanic's liens, which may be recorded upon compliance with the terms of the escrow and this Order.

(v) Prior to Closing, Okland shall direct the escrow agent to issue payment from escrow of the amount of Okland's pro rata calculations of Kearney's unpaid balance of $2,669,953.

(vi) After the payment from escrow described in the immediately preceding paragraph, Kearney shall retain its claim to the balance based on Kearney's pro rata calculations of its unpaid balance of $3,169,965.

(vii) Subject to scheduling, Kearney and Okland agree to mediate their dispute as soon as possible.

(viii) In the event mediation is unsuccessful, upon notice, Kearney and Okland will request the Court schedule an evidentiary hearing on the dispute with pre-trial discovery deadlines as may be appropriate.

(ix) The Holdback shall not be released unless and until the dispute between Kearney and Okland is either settled or fully and finally adjudicated.[58]

## F.    The Kearney/Okland Contested Matter

### 1.  Summary of the Okland/Kearney Dispute

Unlike many disputes between an owner, a general contractor and their subcontractors, here, there is a general consensus that Okland and Kearney fully, timely

---

[58] DE 622.

and capably completed the work they accomplished directly for Legacy and the work Kearney performed under the Okland Subcontract Agreement. From Okland's perspective, the Kearney/Okland "dispute turns on whether all the costs associated with that work are allowable under the operative contracts and supported by the backup Kearney provided." From Kearney's point of view, this matter "is quite simple . . . Okland must pay Kearney the full amount it received from [Legacy] and [Pacific] for Kearney's work . . . That amount is $2,425,023 and as Okland has only paid Kearney $1,953,338, the amount still due Kearney is $471,685."

From the Court's perspective, there is little overlap between Okland's view of how this dispute must be resolved and how Kearney believes this Court must rule. Okland would have this Court engage in a close inspection of the construction terms set forth in the Subcontract Agreement, the Work Order, the scores of change orders and the mountain of paperwork which supports or fails to support Kearney's claims. Kearney, on the other hand, would essentially have the Court ignore that paper trail and focus on the deal(s) struck to bring to fruition the sale of the Sports Park.

### 2. The Motion for Summary Judgment

Kearney filed a Motion for Summary Judgment ("MSJ")[59] in which counsel described the background of Kearney's dealings with Okland, Legacy and Pacific and then argued, in essence, that Legacy paid Okland 75.14% of Okland's asserted claim of $25,254,538.31 so Kearney should be paid the same percentage of its asserted claim of $3,169,965. Kearney noted that Okland's claim included the Kearney claim of $3,169,965 so 75.14% of these funds must be passed through to Kearney, especially since Kearney had an agreement with Legacy and Pacific to the effect that it would accept such

---

[59] DE 782.

amount. Kearney's MSJ was supported by a Statement of Facts,[60] Declaration of Michael Kearney[61] and Declaration of Greg Cahill.[62]

Okland opposed the MSJ[63] asserting that Okland's agreements with Kearney required that, before Kearney was entitled to be paid on the COR's in controversy, Okland had to first accept Kearney's COR's in writing and that it had not done so. Okland also contended that Okland met with Kearney and reached an agreement on Kearney's unpaid balance of $2,669,954.[64] Kearney filed its reply.[65] Oral argument was heard by the Court at which time the Court denied Kearney's MSJ finding that genuine issues of material fact existed in the contested matter dispute between Kearney and Okland.

### 3. The Trial

On November 14, 2024, the parties filed their Joint Pre-Trial Report noting seven fact issues and four legal issues to be decided by the Court.[66] A three-day trial was held from November 18-20, 2024. The Court heard testimony from Kearney employees Stephen Kawulok ("Kawulok") and Michael Kearney ("Mr. Kearney"), Legacy lawyer J. Michael Baggett ("Baggett"), Okland employee Fisher and Legacy's project manager, Marc Taylor ("Taylor"), an independent contractor. 276 exhibits were admitted at trial, all by stipulation of counsel. These exhibits are identified in the Exhibit List[67] filed with the Court.[68] While the Court admitted each of the exhibits into evidence, pursuant to the

---

[60] DE 783.
[61] DE 785.
[62] DE 786.
[63] DE 819.
[64] Ex. B to the Fisher Declaration attached in support of the objection to Kearney's Motion for Summary Judgment is an email exchange from November of 2022. DE 820-1 at 23–24. That email exchange is also identified as Trial Ex. 264. It is clear to this Court that Mr. Kearney, in his response on that email trail was <u>not</u> agreeing that Kearney's claim was $2,669,954. Rather, Mr. Kearney, in his responsive email noted the Kearney indirect claim exceeded $3 million.
[65] DE 822.
[66] DE 872. The Court explicitly addresses each of these stated factual and legal issues in § VI, below.
[67] DE 889.
[68] Ex. 3 is a list of all the COR's at issue in the trial of this contested matter.

parties' stipulation, the Court advised the parties that exhibits not discussed at trial or in closing briefs may not be considered by the Court.[69] The trial testimony and exhibits will be described in greater detail below in § IV.

Post-trial briefs were filed by Okland[70] and Kearney.[71] Responsive memoranda were filed by Kearney[72] and Okland.[73] Oral argument was held on February 13, 2025, after which this Court took the matter under advisement.

## II. JURISDICTION

The Court has jurisdiction over this bankruptcy case and the issues described in this Order pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), (B), (K), and (N). Both parties agree this Court has jurisdiction to enter final orders in this Adversary Proceeding.[74]

## III. ISSUES

1. Did Legacy accept Kearney's COR's for both Kearney's direct and indirect claims?

2. Did Legacy hold the unilateral power to decide whether all of Kearney's claims were acceptable?

---

[69] DE 884, p. 15, ll. 17-21.
[70] DE 894.
[71] DE 895.
[72] DE 897.
[73] DE 898.
[74] Okland filed its proof of claim against Debtor on June 30, 2023, at Claim No. 36 in the amount of $25,254,538.51. Kearney filed its proof of claim against Debtor on June 29, 2023, at Claim No. 25, in the amount of $5,350,104.25. See also the comments of counsel at the November 20, 2023 sale hearing (beginning at the 23:30 time mark) where both Okland and Kearney consented to this Court's jurisdiction to enter final orders in this contested matter.

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Trial Testimony

#### 1. <u>Kawulok</u>.

Kawulok's testimony is summarized as follows:

He has worked for Kearney for three years and is a senior project manager for large construction. He was at the Sports Park every day while Kearney was on the job, usually from 5:00 a.m. to 5:00 p.m. He was Kearney's main contact with Okland and Legacy. His counterparts at Okland were Joe Kranz ("Kranz") and Todd Smith ("Smith"). Kawulok saw Kranz at the Sports Park once or twice a week. Okland's star witness at the trial, Fisher, was not at the Sports Park during construction. Legacy's main contact at this project was Taylor. Taylor was with MTI, an entity which served as Legacy's program manager. Kawulok had contact with Taylor most every day.

Kearney had three different roles on the Sports Park construction job. Kearney did direct construction work for Legacy and indirect work through Okland's contact with Legacy and, finally, Kearney did datacom work directly for Legacy. Kawulok was not involved in the datacom work. Neither the datacom work nor the direct construction work by Kearney for Legacy are at issue in this contested matter.

Kawulok discussed the Subcontractor Agreement[75] and the Work Order[76] but noted the work Kearney performed is primarily fleshed out in Kearney's COR's. The Sports Park was not designed and planned before Kearney was paid $853,000 to "mobilize" on the Sports Park construction site. Rather, the project was designed as the work proceeded. The work was eventually described and agreed to through the many COR's. Field Bulletin's and Contract Change Directives ("CCD") were constantly issued by Legacy's agents and passed on to Okland who, in turn, passed the CCD's on to

---

[75] Ex. 1.
[76] Ex. 2.

Kearney. CCD's occasionally came directly to Kearney from Legacy for work Kearney was doing directly for Legacy. When CCD's came to Kearney it either issued a COR in the form of a cost estimate before beginning the work called for in the Field Bulletin or CCD or, if there was insufficient time for Kearney to prepare and deliver a cost estimate, Kearney issued COR's with time and materials charges plus a markup of 15%.

Kearney initially estimated it would need to employ 60 to 70 electricians on this job. As the CCD's rolled in, Kearney eventually employed up to 150 to 160 electricians at this job on any given day or night.

Neither the Subcontractor Agreement nor the Work Order reflect an agreed upon labor rate for Kearney's work at the Sports Park. Rather, the detailed COR's issued by Kearney consistently noted its hourly rate at $65/hour. This rate is a composite rate blending the lowest rates paid by Kearney to helpers and apprentices with the rates paid to journeymen electricians and supervisors. Kawulok noted that, at that time, Kearney's composite rates were usually in excess of $70/hour and that the $65/hour rate was a "cutthroat competitive rate" which was to be billed on this job. Kawulok could not identify all the charges that were used to build this $65/hour composite rate. Overtime was charged by Kearney on the Sports Park job at time and a half ($97.50/hour). Holiday time was charged at double time ($130/hour). Neither Legacy nor its program manager MTI ever objected to Kearney's hourly rates. Kearney's "General Conditions" were built into all of its COR's.

Kearney was paid over $13 million without question or controversy from Legacy, MTI or Okland. All that work was charged at the $65/hour base rate. This constitutes about 90% of Kearney's hourly charges on the Sports Park job. Okland charged a three percent fee on top of the billings of its subcontractors. It was not until near the end of this project that Okland questioned some of Kearney's COR's including Kearney's hourly

rate. Legacy never questioned any of Kearney's charges for the work Kearney performed directly for Legacy.

Kawulok discussed a sampling of COR's. In particular, he walked through Ex. 112 (Pay Application 01), Ex. 151 (Pay Application 9), Exs. 115, 123, 124 and 168 (Subcontract Supplements) and Ex. 5 (COR 32) and Ex. 9 (COR 53). He testified that all of the materials and subcontractors charges billed to Okland or Legacy were actually paid by Kearney. The hours actually worked by Kearney people are the hours paid for by Kearney and are the same hours billed by Kearney to Okland or Legacy. Kawulok testified that Kearney's overtime charges were also actual charges which were paid by Kearney.[77] Kawulok noted nobody from Okland or Legacy objected to any of these billings which reflected a $65/hour rate and an overtime rate of an additional $32.50/hour. However, once Kearney finished its work in January 2022, Smith and Kranz told Kawulok that Kearney's final COR's would be best received and more likely agreed to be paid by Legacy if some of Kearney's hours would be reduced to $60.45/hour. Kawulok agreed to reduce the rate to $60.45 on some of Kearney's COR's.[78] Okland did not question Kearney's hourly rate thereafter. Kranz and Smith accepted Kearney's COR's and submitted Kearney's final COR's to Legacy in March 2022.

Legacy and Taylor were surprised by the magnitude of all the final COR's submitted to it by Okland (including COR's submitted by Kearney) after construction was concluded. MTI made red ink comments on a number of Kearney's final COR's. Documents and comments were exchanged with MTI. One of the questions raised by MTI was the magnitude of labor charges relative to materials installed. Kawulok was puzzled by this because, he said, labor charges are based on complexity of the job, not the amount of materials installed and this CCD called for very complicated work. While

---

[77] DE 883, p. 90–91.
[78] *See, e.g.*, Ex. 9, COR #53, Rev. 1; *See also*, Ex. 31, COR #83 initially issued on December 31, 2021, and then revised on May 3, 2022.

MTI questioned some of Kearney's billings, neither MTI nor Legacy nor Okland ever rejected Kearney's COR's.[79] Instead, when MTI raised questions concerning Kearney's billings, Kawulok responded in blue ink on the same documents bearing MTI's red ink comments. Kearney never heard further from Taylor, MTI or Legacy. It was around this time that Kawulok began to hear rumors of Legacy's financial difficulties.

Kawulok originally thought this was going to be an $8 million Kearney job but, with so many architectural and engineering job revisions, the Kearney side of this project ballooned to well over $14 million. Many of the job revisions required Kearney to redo work already completed. Often work done by Kearney had to be redone when other trade groups damaged Kearney's completed work.[80]

The single biggest COR issued by Kearney and discussed at trial was COR #67,[81] a Kearney pre-work cost estimate dated December 2, 2021, in the amount of $771,834. Kawulok testified that this estimate was in response to Field Bulletins 75 and 75.1 pertaining to a massive job on the Sports Park's main street, Miller Way. While this Field Bulletin was dated in October 2021, it did not get to Okland until November 9 and then sometime later to Kearney. Like every new work directive (via a Field Bulletin or a CCD), Kearney was expected to get the new work done without a grant of additional time to complete the work. This meant that Kearney had to bring large numbers of electricians to the job, often at overtime rates. In some instances, to induce workers to do this expedited work, Kearney would have to pay electricians overtime or holiday time, even if they had not yet worked a full eight-hour day that week. This explains why COR #67 (done in December 2021 and January 2022) labor charges were all at overtime rates. If Kearney failed to complete the work on time and the opening date of the Sports Park had

---

[79] See the red and blue lined documents identified in Ex. 187. See also, for example, Ex. 38, MTI red ink markups to COR 92.
[80] See COR #156, Ex. 95 as an example of charges incurred due to another contractor's damage to Kearney's work. This COR was revised to change $60.45/hour per the request of Kranz and Smith.
[81] Ex. 21.

to be postponed due to Kearney's delay, Kearney would be subject to an assessment of very large liquidated damages. Importantly, Kearney did not begin the work on COR #67 until its estimate was accepted by Okland and Kranz and/or Smith told Kearney to get to work. This was crucial because at that time, Kearney was already owed about $1.3 million and strongly felt that this new additional work requirement was a big mistake. Kawulok wanted to make sure Okland was in agreement with Kearney's COR #67 cost estimate before they began work on this large and very expedited new Field Bulletin.

The Court finds Kawulok's testimony to be entirely credible and further finds Kearney's hourly charges, overtime charges and materials charges were paid for by Kearney and were not controverted by any evidence offered by Okland. The Court also finds Kearney did not begin work on COR #67 until Kearney's cost estimate was approved by Okland.

### 2. Baggett.

After construction was completed at the Sports Park, Baggett a Pittsburgh, Pa. attorney, worked with Legacy to try to negotiate a deal with Okland to resolve its unpaid claims.[82] These pre-bankruptcy negotiations involved Legacy, Okland and Taylor but did not include Kearney or any other subcontractors. Okland claimed it was owed about $26 million. The amount sought by Okland included amounts asserted by all of Okland's subcontractors. Legacy had insufficient funds to satisfy all those claims. Okland and Legacy agreed to an August 2022 settlement at $21.3 million but Legacy could not obtain the financing to consummate that agreement. There were subsequent Legacy/Okland settlement discussions before the Petition Date but they never came to an agreement.

---

[82] Baggett works at the Pittsburgh law firm of McCann, Garland, Ridall and Burke. He incorporated Legacy in June 2018. *See* Adversary Proceeding 2:25-ap-00103-DPC, Complaint filed by the Legacy Cares Liquidating Trust on February 28, 2025.

Baggett agreed Taylor would be better qualified than Baggett to discuss Legacy's questions concerning Kearney's billings.

The Court finds that Baggett was a credible and competent witness who was careful to not overstate his testimony. Baggett's testimony made it clear to the Court that Kearney was not involved in the Okland/Legacy settlement talks that produced the August 1, 2022 settlement agreement. Baggett's testimony also made it clear that the August 2022 agreement was never consummated and that no other settlement was reached prior to the Legacy bankruptcy filing.

### 3. Taylor.

Taylor was called as a witness by Okland. He is the President of MTI which was hired on the Sports Park project as Legacy's program manager when the prior construction group, JS Waltz Construction, LLC, was terminated. MTI has expertise in oversite for the construction of sports facilities. As the Sports Park was built, MTI had responsibility for document control on design changes passed on to Okland and its subcontractors. MTI also had COR review responsibility.

Taylor discussed Field Bulletins, CCD's and the paperwork he wanted to see if a subcontractor was to charge on a time and materials basis. Taylor specifically addressed:

1. Ex. 17[83] and his questions related to the hours billed and overtime asserted by Kearney;

2. Ex. 211.[84] Taylor questioned the number of hours billed and whether some people worked 20-hour days;

---

[83] COR #62 dated December 1, 2021.
[84] COR #91 dated January 11, 2022, and revised May 3, 2022.

3.       Exs. 21 and 200.[85] This was the single largest Kearney COR in controversy at $771,834.95. Taylor questioned the magnitude of the hours charged relative to lower costs of materials involved;

4.       Ex. 37[86] bearing MTI's red ink comments and Kearney's blue ink responses.

5.       Ex. 184. The Legacy/Okland settlement dated August 1, 2022.

6.       Ex. 13[87] bearing MTI's red ink comments and Kearney's blue ink responses.

7.       Ex. 187. Smith's March 22, 2022 email to Kawulok containing MTI's red ink comments to a number of Kearney's COR's.

Taylor acknowledged that, for the work Kearney did directly for Legacy, MTI had no issues regarding Kearney's billings (including its $65/hour standard rate) and so Kearney should have been paid in full. As to the Kearney work done through Okland, Taylor was not sure whether MTI had any problems or questions about Kearney's billings until the very end of the project. Taylor acknowledged this project was rushed and that Kearney was not given time extensions by MTI, so it was no surprise to Taylor that Kearney COR's would include labor overtime.

Taylor noted Kearney did a fantastic job getting through this project. Taylor said he was surprised by the magnitude of COR #67 and felt it could have been better managed if he received daily expense tickets. Taylor recalled thinking that Kearney's $771,834 COR #67[88] should probably be paid $450,000 to $500,000. However, "in no way do we

---

[85] COR #67 dated December 2, 2021 for $771,834.95.
[86] COR #91 dated January 11, 2022, but then revised on May 3, 2022 for $17,905.09 pertaining to relocation of lighting in GOAT bar.
[87] COR #58.
[88] Ex. 21; Ex. 200.

reject everything that came our way" from Kearney.[89] Rather, Taylor sought to resolve issues regarding Kearney's COR's.

After MTI questioned some of Kearney's charges in March of 2022, Taylor recalled Kearney responding in blue ink notes near MTI's red ink notes but Taylor does not recall ever responding to Kearney's blue ink note explanations. Taylor acknowledged that MTI's red ink notes were not rejections of Kearney's COR's but, rather, were questions raised by MTI to which Taylor wanted responses from Kearney. None of MTI's red ink notes questioned Kearney's $65/hour standard rate. Nor did any of MTI's red ink notes request Kearney's backup documentation, including time records.

Taylor heard a rumor in December 2021 or January 2022 that Legacy had run out of money. When Okland submitted $24 million in COR's, contract balances and retention in March 2022, Taylor knew Legacy could not pay them.

Taylor was involved in the Okland/Legacy settlement discussions in July and August 2022. He had no recollection of Fisher playing much of a role from Okland in any respect. Taylor's contacts with Okland were primarily with Kranz and Smith. Kearney's COR's had not been reconciled in August 2022, so Taylor felt Okland would need to work with Kearney if that $21.3 million settlement deal was consummated. Taylor did not know how Kearney's claim fit into those settlement discussions or in the settlement amount. Taylor had no idea how much money Legacy had available in August 2022. However, that Legacy/Okland settlement never was consummated. Once the August 2022 settlement fell apart, there were no further discussions by Taylor regarding any of Kearney's COR's.

The Court finds Taylor was an affable witness but his testimony was disjointed, largely unclear and not very useful in the resolution of this contested matter. Taylor consistently did not recall events, admitted he was "having a hard time trying to

[89] DE 884, p. 53, ll. 13–14.

communicate this"[90] and essentially recognized the financial elements of Kearney's work would be more appropriately addressed by MTI employee Brian Quintana.[91] Notwithstanding these problems with Taylor's testimony, the Court does find that neither Taylor nor MTI nor Legacy ever rejected any of Kearney's COR's.

### 4. Mr. Kearney.

Mr. Kearney has been the President of Kearney for six- and one-half years. His father ran the business before him. He noted Kearney's standard labor rates in April 2021, were $70 to $75 per hour which was then a "fair and reasonable rate."[92] Nevertheless, Kearney charged $65 per hour as its standard rate on the Sports Park project.[93] MTI managed oversight and payment of Kearney's direct work and billing rates for Legacy as well as Kearney's indirect work and hourly rates charged through Okland.

When Kearney's direct and indirect work on the project was completed, Kearney was still owed about $5.3 million. Kearney would not accept less than $4 million to resolve its unpaid claims.[94] Mr. Kearney made this well known to Legacy and MTI and Okland. He pointed to his attorney's email exchange with counsel for Pacific, Legacy and others on October 23, 2023,[95] in which it was made clear Kearney would not accept less than $4 million to settle its lien claims. Pacific's counsel, Andy Abraham, noted that $19 million would be paid at the sale closing which would result in payment to all materialmen in the amount of 75.14% of the principal balance of their stated claim amounts.

---

[90] DE 884, p. 44, ll. 7–9.
[91] DE 884, p. 105, ll. 8–10.
[92] DE 884, p. 123, ll. 18–25.
[93] DE 884, p. 120.
[94] DE 884, p. 128, ll. 19–20.
[95] Ex. 180.

1    Mr. Kearney emphasized that Kearney expended considerable amounts on legal

2 fees in connection with its efforts to get paid on the Sports Park project.

3    On cross examination, Kearney reviewed an April 15, 2022 email exchange

4 between Okland and Kearney regarding the Kearney "Labor Burden Calculator"[96] to

5 reflect a $65 per hour blended hourly rate used by Kearney on the Sports Park job. Mr.

6 Kearney confirmed in his testimony that when his email to Okland said "[w]e will

7 concede on this project a lower rate as listed in the spreadsheet [Kawulok] will send

8 over," he meant Kearney would charge $65 per hour on the Sports Park project, an

9 amount less than its standard $70 to $75 per hour.

10    The Court finds Mr. Kearney's testimony at trial was credible.[97] The Court further

11 finds Kearney would not and did not settle its direct and indirect claims for less than

12 $4.0 million.

13

14        5.  Fisher.

15    Fisher is an Okland employee of 21-years with degrees from Brigham Young

16 University (B.S. in Finance) and Arizona State University (Masters in Finance). Fisher

17 is Okland's Director of Finance. He was an articulate witness called for the purpose of

18 explaining issues Okland had with charges asserted by Kearney on the Sports Park job.

19 He is well versed in creating Microsoft Excel spreadsheets. The primary spreadsheet

20 discussed was a helpful recap of Kearney's work on the Sports Park through Okland.[98]

21 He noted that, while the original Kearney Work Order[99] called for work totaling

22 $853,000, the bigger portion of the Kearney work approved by Okland and paid by

23

---

24 [96] Ex. 186.
[97] The Court noted with interest that, at the conclusion of Mr. Kearney's testimony, he was warmly greeted by
25 Okland's lawyer and officers. They all seemed to know each other well, presumably due to many years of working
together on various projects. There appeared to the Court to be no hard feelings between Okland and Kearney
despite their being adversaries in the contested matter at issue.
26 [98] Ex. 269.
[99] Ex. 2.

Legacy was via Kearney COR's. The COR's approved by Okland and paid by Legacy totaled $13,215,000.

Fisher's primary work on the Sports Park began in March 2022. He was tasked with closing out unresolved financial issues. He described his role as requiring that he be fair and reasonable in resolution of all issues. He considered his role to be a "fiduciary duty" because Okland's trade partners (i.e. subcontractors) are crucial to Okland's success. He indicated Kearney did a fantastic job getting the Sports Park project across the finish line. He was very involved in the discussions that culminated in Okland's executed, but unconsummated, settlement agreement of August 2022.

Fisher referenced a March 22, 2022 email exchange between Smith of Okland and Kawulok at Kearney in which they discussed MTI's red-colored markups on Kearney's COR's.[100] He also pointed to an April 18, 2022 email exchange between Okland employees Smith and Kranz and Kawulok about issues within Kearney's COR's, namely additional charges Okland believed were already accounted for in the labor rate.[101] Fisher noted he prepared the April 18, 2022 email.[102] He took issue with additional charges for general conditions, medical costs, consumables, productivity costs and paid time off.[103]

Fisher, to illustrate Okland's disputes generally, questioned the aforementioned duplicative charges and possibly excessive overtime in Kearney's COR #67.[104] Fisher raised these issues well after Kearney completed its work. Moreover, Fisher was not at the job site, so he could not opine as to whether Kearney employees worked overtime or were paid for that overtime. Smith and Kranz were on the job site on behalf of Okland but were not called as witnesses at the trial. However, throughout his testimony, Fisher noted that Kearney never responded to Okland's requests for documentation to support

---

[100] Ex. 187.
[101] Ex. 259.
[102] *Id*.
[103] *Id*.
[104] Ex. 200; *See also* Ex. 259.

the overtime contained in the COR's questioned by MTI and then by Fisher. Fisher stated he was the person who input red-colored comments on COR #44[105] and that MTI made red-colored comments to COR #62[106]. Fisher also discussed COR #83,[107] COR #84,[108] COR #91,[109] COR #94[110] and COR #99,[111] questioning the overtime or holiday charges contained in those COR's.

Once Fisher became actively engaged in the winddown of the Sports Park project in March 2022, he was in constant communication with Legacy and Taylor but also with Kearney, even after Kearney responded to Fisher's and MTI's red-colored questions concerning Kearney COR's. Fisher discussed how Kearney signed Subcontract Supplement No. 1[112] without any disagreement, agreeing to the proposed expansion of the scope of work and contract value. Fisher emphasized that Okland did not and is not challenging any of the Kearney COR's which were paid in the aggregate amounts in excess of $13 million.[113]

Fisher discussed Okland's Credit Log[114] and an email dated August 1, 2022,[115] as they related to credits Okland believed should offset the amounts in the pending COR's. He explained that this project involved an "Owner Controlled Insurance Program ("OCIP").[116] In summary, Fisher explained that when the general contractor (Okland) pays general insurance and/or workers compensation on a construction project, the subcontractors (here Kearney) are not to charge their insurance expenses to the project via their general condition charges. Fisher contends that the $65 hourly rate charged by

---

[105] Ex. 273.
[106] Ex. 197.
[107] Ex. 31.
[108] Ex. 32.
[109] Ex. 211.
[110] Ex. 214.
[111] Ex. 218.
[112] Ex. 115.
[113] *See* Ex. 272, a listing of the Kearney COR's which were approved and paid.
[114] Ex. 270.
[115] Ex. 263.
[116] *See* Ex. 270, Ex. 263, Ex. 266.

Kearney on this project improperly includes Kearney's insurance expenses, and therefore, Okland was owed credit in the amount Kearney paid for such insurance expenses.

Fisher then turned to his February 2024 Kearney Issues Recap,[117] which was a spreadsheet detailing the reductions and rejections Okland and/or MTI had with each pending Kearney COR. The Issues Recap included four "buckets" for labor rate reductions: (a) reducing the Kearney rate from $65 to $60.45, (b) removal of 50% of the overtime charges, (c) removal of duplicative general conditions and (d) miscellaneous reductions.[118] Between these reductions and credits Okland asserts it was owed, Fisher estimated that the total value of reductions on the pending Kearney COR's was $835,000, an amount well in excess of the $471,685 sought by Kearney in the contested matter.

Fisher addressed an email he sent to all subcontractors (through Okland's lawyer) on October 23, 2023.[119] It detailed a final settlement offer of $19,734,573 and a 73.16% return to each subcontractor.[120] Under the proposed resolution, Kearney was to receive $1,953,338 to settle its claim.[121] Approximately 90% of Okland's subcontractors agreed to these terms but Kearney did not. Fisher concluded his direct examination by returning to the spreadsheets he prepared to summarize his questions regarding Kearney's COR's.[122]

On cross examination, Fisher agreed that, while Okland received 76.5% of the principal balance of all amounts claimed by Okland and its subcontractors on the Sports Park job, the subcontractors (including Kearney) were to receive only 73.16%. He said this was justifiable considering the risk Okland had assumed in agreeing to either

---

[117] Ex. 268; Ex. 269.
[118] Id.
[119] Ex. 179.
[120] Id.
[121] Id.
[122] Ex. 268; Ex. 269.

(a) work through disagreements with its subcontractors or (b) bond around their materialmen liens.

In discussing the August 1, 2022, settlement,[123] Fisher estimated that Okland would retain at least an amount south of $5 million on account of its fee of 3.5% of the charges paid to the subcontractors. In addition, although Fisher testified that he was acting as a fiduciary for all of Okland's subcontractors, Okland alone was to receive numerous sale benefits such as $10,000 per year value for usage of the Sports Park, four lifetime passes and discounts at the GOAT restaurant at this facility.[124] While that settlement was never consummated, Okland never repudiated the settlement. Instead, it used the $21 million amount and the principal balance of all its subcontractors' claims as a springboard for the settlement eventually agreed to by Okland as a part of the sale of the Sports Park.[125]

Importantly, Fisher admitted that there was no document assigning Okland responsibility for approving or rejecting COR's and that Okland could not settle a mechanics' lien claim on a subcontractor's behalf without their authority. Neither Pacific nor Legacy voiced an issue with Kearney's COR's in the settlement discussions, instead requiring Okland to resolve any open issues or bond around the liens. Of the $15 million + paid to Okland from the sale closing,[126] Okland retained $6 million for its 3.5% general contractor fee and then assessed $400,000 to the subcontractors for coverage of two-thirds of Okland's attorneys' fees incurred in pushing for payment on the project.[127] Fisher testified that this $400,000 amount was just a portion of its fees incurred in excess of $600,000.

---

[123] Ex. 184.
[124] Ex. 184, § 6.
[125] Ex. 185, p. 74.
[126] Ex. 185.
[127] This $400,000 assessment was justified under the "Common Fund Doctrine," discussed below.

Fisher acknowledged that neither the Okland-Kearney Subcontract Agreement nor the Work Order specified an hourly rate which Kearney was to charge on the Sports Park project.[128] Nevertheless, Fisher testified extensively about the Kearney $65 per hour rate and how he calculated $60.45 per hour to be the appropriate rate. His spreadsheet reflected this rate contrast.[129] Fisher did not identify any agreement between Okland and Kearney where Kearney agreed to charge only $60.45 per hour, rather than $65 per hour. Fisher was then shown COR #3,[130] COR #2,[131] COR #7[132] and COR #50,[133] all of which were included in the group of undisputed and paid COR's. Fisher acknowledged that each of those COR's included a labor rate of $65 but made sure to mention that COR #'s 2 and 3 did not have any associated hours worked.

On October 23, 2023, Pacific's lawyer sent an email to a collection of the general and subcontractors' attorneys, offering 75.14% of the principal amounts of all lien claims to satisfy 100% of the mechanics' lien claims.[134] Okland rejected this 75.14% payout from the Sports Park sales proceeds.[135] Kearney lawyer Cahill emailed Okland's lawyer Csontos on October 24, 2023, voicing Kearney's refusal of Okland's proposed payout to Kearney from the settlement proceeds.[136]

The Court finds that Fisher was an articulate witness. The Court also finds Kearney never agreed to accept $60.45 as its standard rate on this job yet did agree to do so in isolated instances simply as an accommodation to Okland.[137] The Court also finds that, while Fisher raised any number of issues concerning OCIP, equipment and trade damage, excessive overtime or holiday hours, Okland's challenges are hereby rejected

---

[128] Ex. 1; Ex. 2.
[129] Ex. 181.
[130] Ex. 123.
[131] Ex. 124.
[132] Ex. 131.
[133] Ex. 168.
[134] Ex. 178.
[135] DE 885, p. 81, ll. 19–20; Ex. 178.
[136] Ex. 181.
[137] Ex. 268; *See, e.g.*, Exs. 9, 18, 25, 26, 31, and 32.

because Legacy and Pacific implicitly agreed to the principal amount of the indirect claim asserted by Kearney in exchange for a 23.5% reduction in Kearney's indirect claim.

## B. The Parties' Contracts and Kearney's Ultimate Resolution With Legacy

### 1. The Contracts

The Subcontract Agreement between Okland and Kearney is fairly generic. It does not mention the Sports Park or the labor rates to be charged by Kearney. Further, although the Work Order mentions the Sports Park, it provides very little insight into the Sports Park project or how the parties were to orchestrate the building of that project. The Work Order does not mention Kearney's labor billing rate. What is clear is that, with respect to its indirect claims, Kearney was to be paid from what Okland was paid on this job. If Okland was not paid, Okland had no obligation to pay Kearney.[138] Okland refers to this as the "pay when paid" clause which is a part of the Subcontract Agreement's "conditions precedent" clause. Specifically, that provision of the Subcontract Agreement states:

> 31.     PAYMENT. Subject to the provisions in this Subcontract, Contractor [Okland] shall pay Subcontractor [Kearney] for that portion of the Work completed in the prior month. Contractor shall not, however, be obligated to make progress payments to Subcontractor unless and until Contractor has received all of the following for the Work that is the subject of the Subcontractor's application for a progress or final payment:
>
> > (a) a certificate of insurance demonstrating that insurance, if any, required by this Subcontract will remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to Contractor;
> >
> > (b) a properly completed and executed application for payment, accompanied by the following documents;
> > > (i) releases of all claims and liens in a form satisfactory to Contractor;

---

[138] *See* Ex. 1, p. 8, § 31, ¶¶ G, H and I.

      (ii)  an affidavit that payrolls and other indebtedness connected with the Work have been paid or otherwise satisfied, or will be satisfied with the funds requested (other than work for which releases of claims and liens have been provided);

      (iii) receipts for payment of health, welfare, pension, and any other benefit funds payable as required by collective bargaining agreements, if any;

      (iv) certified payrolls, if required;

      (v)  all requested reports described in Section 17 for the time period covered by the application for payment;

      (vi) confirmation that record drawings of the work are current, if requested;

(c) satisfaction that Subcontractor has corrected all complaints involving Subcontractor's Work;

(d) completion of the Work in accordance with terms and conditions of the Subcontract Documents;

(e) correction or replacement of any Defective Work;

(f) inspection and acceptance of the Work by Contractor, Owner, Architect (at Owner's discretion), and governmental authorities, to the extent required under the Subcontract Documents;

(g) acceptance of Subcontractor's application for payment by Contractor, Owner, and Architect (if required);

(h) payment from Owner, to the extent of the amounts received on Subcontractor's behalf;

(i) any other information or documents Owner requires including, without limitation, any breakdowns or a schedule of values for the Work; and

(j) issuance of a certificate or certificates of occupancy prior to final payment.

Receipt of each of these items is a condition precedent to Contractor's obligation to make any payment to Subcontractor. Contractor may refuse payment to Subcontractor in whole or in part unless and until these conditions are satisfied. All payments to Subcontractor under this Subcontract shall be made by Contractor solely and exclusively out of funds Contractor receives from Owner. Subcontractor acknowledges that it shares, to the extent of payments to be made to it, in the risk that Owner may fail to make one or more payments to Contractor for all or a portion of the Work.

…

Notwithstanding the provisions in the Subcontract Documents, Contractor will pay Subcontractor in conformance with applicable laws.

1      When this Subcontract Agreement is modified, such modifications are referred to

2  as "Changes." Section 22[139] of the Subcontract Agreement states:

> Without invalidating the Subcontract and without notice to
> any surety, Contractor may, at any time, in a writing executed
> by Contractor's project manager, direct additions, deletions,
> or revisions in or acceleration of the Work ("Changes"). Any
> such Changes shall be binding upon Contractor and
> Subcontractor upon execution by Contractor's project
> manager. Upon receipt of such directive, Subcontractor shall
> proceed with the Work promptly and perform it under the
> applicable conditions of the Subcontract Documents.
> Subcontractor shall not perform any Changes in the Work nor
> be entitled to any adjustment in Subcontract Price or
> Subcontract Time for any work performed without prior
> written authorization by Contractor's project manager. Such
> written authorization shall be on a change order form
> acceptable to Contractor and shall include a description of
> the change in the Work and approved labor rates. Adjustment
> to the Subcontract Price or Subcontract Time shall be
> supported by documentation acceptable to Contractor,
> including, but not limited to, a breakdown of quantities and
> rates for labor, material, and equipment. Except as provided
> in this Section and Sections 23-24, the terms and conditions
> of this Subcontract are not otherwise subject to addition,
> modification, or change.
> For changed work performed on a time and materials basis,
> Subcontractor shall submit to Contractor at the end of the day
> when the work is performed the following: (1) a detailed
> description of the work performed; (2) the location of the
> work performed; (3) the names, trade, and man-hours for all
> labor performed, with separate identification of straight and
> overtime hours; (4) descriptions for each item of materials
> used to perform the work; (5) descriptions for each item of
> equipment used to perform the work; (6) a signature of
> Contractor's superintendent approving only the hours,
> materials, and equipment used to perform the time and
> material work; and (7) a signature of Subcontractor's
> authorized representative.

---

[139] Ex. 1, p. 5–6.

Okland contends Kearney failed to carry its burden to demonstrate satisfaction of all of the conditions precedent to Okland's payment to Kearney or as to the paper trail required when there are "Changes" to the Subcontract Agreement. In particular, it says Okland did not approve certain COR's in writing, nor did Legacy, as required by Section 31(g). Okland contends that Kearney had the burden of proving what is contractually owed to it by Okland and that it failed to satisfy that burden. Okland argues acceptance of Kearney's COR's, in writing by both Legacy and Okland, is a condition precedent to payment from Okland to Kearney and that Kearney failed to prove it had satisfied this condition precedent.

It is worth recounting how the Sport Park construction proceeded. Because this job was handled under the "Fast Delivery Method," Legacy's people would issue Field Bulletins and/or CCD's requiring that various pieces of work be commenced by Kearney before a price for that work had been established. Following the issuance of a CCD, sometimes Kearney would issue a COR (a pricing estimate) describing its pricing before Kearney actually began work on that CCD.[140] Sometimes Kearney simply began work on the CCD and then later Kearney would bill for its work via a COR issued once that work was completed. This process worked fine for the first $13 million+ of Kearney's work at the Sports Park. Such work was paid for by Legacy without challenge from Okland or Legacy or MTI. The dispute before this Court, however, pertains to the last CCD's and Field Bulletins issued by Legacy and the COR's issued by Kearney in response to those documents.

### 2. Okland May Not Unilaterally Block Final Payment to Kearney

Okland's attorney's cross-examination of Kawulok seems to suggest that Okland made a final contract adjustment "to reduce Kearney's claim to $2.6 million when it

---

[140] This occurred in connection with COR #67.

signed the August 1, 2022 agreement with Legacy,"[141] but any such adjustment was without Kearney's consent. The Okland-Legacy agreement of August 1, 2022, was not binding on Kearney, and for that matter, was not binding on Okland due to Legacy's failure to perform.

This Court finds, by the time Okland submitted Kearney's final COR's to Legacy and its agent MTI, that Okland, Legacy and Taylor (MTI's principal) knew the Sports Park construction job was in financial trouble. It is not clear to the Court that Kearney knew of this financial problem as it was finishing its work. The Court finds MTI and Okland began questioning Kearney's billings only once Legacy, MTI and Okland came to realize there would likely not be enough money to fully pay Okland and all its subcontractors. In other words, it was the financial difficulties facing this project that caused Okland and MTI to, for the first time, question Kearney's charges on its indirect work at the Sports Park.

This is not to suggest MTI or Okland were acting in bad faith by suddenly questioning Kearney's billings. Some of Kearney's charges did appear high. For example, Fisher reasonably wondered whether all of Kearney's electricians could really have been working entirely at overtime rates for the time periods covered by COR #'s 67, 83 and 84. Fisher also questioned why Kearney would be entitled to pass through on its bills certain insurance charges where this was a job managed under an Owner Controlled Insurance Program. He also pointed out that he thought certain other "General Conditions" many have been double billed by Kearney in its last few COR's. All of these were fair questions of Kearney when they were raised by Okland and/or MTI. But all of these questions were answered by Kearney in its responses to the red ink markups by MTI and/or Okland. Neither Taylor (acting as an agent for Legacy) nor Okland ever rejected Kearney's responses to their questions but, as Okland correctly points out,

---

[141] DE 883, p. 190, ll. 9–12.

neither did MTI or Okland approve those Kearney COR's in writing. But Okland's contentions miss the crucial point: Legacy, Pacific and this Court did approve a 76.15% payment to Okland in final settlement of all Okland's claims against Legacy, Pacific and the Sports Park and in final settlement of all Okland's subcontractors' claims against Legacy, Pacific and the Sports Park. Kearney fairly described the November 2023 contractors' claims resolution as a "No Look" settlement. By this Kearney means that Legacy and Pacific may well have had the contractual power and the facts to support a challenge to the claims of Okland, Kearney and/or other subcontractors, but Legacy and Pacific waived such challenges by agreeing to pay 76.15% of the raw principal amounts Okland and its subcontractors collectively asserted against Legacy, Pacific and/or the Sports Park property.

As the prospects of a sale heated up, on October 23, 2023, Pacific's lawyer sent a final proposal to Okland and all its subcontractors offering them $19 million to satisfy 100% of their claims, noting "[t]his amounts to 75.14% of the principal amount of all lien claims."[142] This proposal came after rounds of discussions between the Buyer, Legacy, Okland, Kearney and others. Hours after receiving Pacific's settlement offer email, Kearney received an email from Okland's lawyer which contained Fisher's proposal to pay Kearney $1,953,338 of its indirect claim from the $19 million offered by Pacific and Legacy from the projected sale closing proceeds. Fisher noted the proposed payment to Kearney would be 73.16% of the principal amount of what Okland contended was Kearney's indirect claim.[143] Fisher also noted that the collective principal amount of the claims of Okland and all its subcontractors totaled $19,734,573. Significantly, this $19.7 million amount included Kearney's indirect claim in the principal amount of $3,169,965 yet Fisher was only proposing to pay 73.16% of a Kearney principal claim

---

[142] Ex. 178.
[143] Ex. 179.

pegged at $2,669,954.[144] Fisher's proposal also required that Kearney and the other subcontractors absorb a pro rata share of $400,000 of attorneys' fees incurred by Okland. So, in summary, while Pacific's lawyer's email was proposing to pay Kearney 75.14% of the principal amount of Kearney's stated indirect claim of $3,169,965, Okland was proposing that (a) from the sale closing, Kearney would only be paid 73.16% of Kearney's claim, (b) Kearney claim would be identified as totaling $2,669,954 even though Okland in its settlement discussions with Pacific, Legacy, et al., was pegging the Kearney indirect claim at $3,169,965 and (c) that Kearney would have to effectively pay Okland 33.459%[145] of Okland's $400,000 legal bill (i.e. $133,838.86). Not surprisingly, Kearney rejected Okland's proposal.[146]

The Court finds Kearney was ready, willing and able to settle with Legacy and Pacific for 75.14% of the principal amount of its direct claim in the Kearney stated amount of $2,155,990. That, in fact, is what happened at the sale closing.[147] Likewise, this Court finds Kearney was ready, willing and able to settle with Legacy and Pacific for 75.14% of the principal amount of Kearney's indirect claim in the stated amount of $3,169,965. Pacific, Legacy, Okland and Kearney were all using $3,169,965 as the principal amount of Kearney's indirect claim in their settlement discussions. Okland was eventually paid $19,968,412 from closing based, in part, on the amount of Kearney's asserted indirect claim. As Kearney's construction litigation lawyer aptly emailed to Okland's lawyer: "Okland cannot, on the one hand, claim this higher amount in settling with the owner/purchase and then turn around and offer Kearney a 'share' based on the lower number of $2.6 million." The Court agrees. The Court further agrees that Kearney was justified in rejecting Okland's demand that Kearney pay a pro rata share of Okland's

---

[144] $1,953,338 ÷ .7316 = $2,669,954.
[145] $3,169,965 (the principal amount of Kearney's asserted indirect claim)/$9,473,975 (the total principal amount of all subcontractors' indirect claims) =33.459%
[146] Ex 181; Ex. 182.
[147] *See* DE 622, p. 74; *See also* Ex. 185, p. 74.

legal fees, since it appears Okland based Kearney's share of such fees on the $3.1 million Kearney claim, not the $2.6 million claim Okland was identifying as the principal balance of Kearney's indirect claim.

Kearney and Pacific and Legacy had an agreement to allow Kearney's indirect claim in full at $3,169,965 but that such claim would be settled at 75.14% of that amount. Since Legacy agreed to this amount, Okland could not point to ¶ 31(g) or ¶ 22 of the Subcontract Agreement and contend Okland could ultimately withhold its written consent to Kearney's COR's thereby denying Kearney a portion of the very payment approved by Legacy. This is especially true where Okland's refusal to approve Kearney's COR's and deny payment to Kearney of over $400,000 would directly enrich Okland in the exact amount Okland hopes to wrest away from Kearney.

The Court further finds that, at the time of the Sports Park sale and Kearney's execution of its lien release and approval of the MOU attached to the Sale Order, Kearney agreed to take no less than $4.0 million from the sale proceeds on account of its direct and indirect claims. Legacy, Pacific and Okland all knew this was Kearney's position. However, the Court also finds that, while Kearney agreed to accept no less than 75.14% of its indirect claim totaling $3,169,965,[148] Kearney's post-trial demand for 76.5% exceeds Kearney's agreed upon percentage of 75.14% and, therefore, this 76.5% distribution is hereby rejected.[149]


3. <u>Direct and Indirect Transfers to Kearney</u>

When Legacy and Pacific agreed to pay 76.15% of the amounts claimed collectively by Okland and its subcontractors, Legacy and Pacific also agreed to pay Kearney 75.14% of its remaining <u>direct</u> claims against Legacy and the Sports Park.

---

[148] That amount totals $2,381,911 but since Kearney's indirect claim was paid $1,953,338 at closing, Kearney is owed $428,573.
[149] *See* DE 895 pages 1–2, n. 1.

Legacy and Pacific wanted, even needed, to sell the Sports Park but could not close the deal unless all lien claims, direct and indirect, against Legacy, Pacific and the Sports Park were released or waived. By October 2023, Legacy and Pacific did not have the time nor the inclination to contest the charges asserted by Okland, Kearney and many others. Legacy, Pacific and the Buyer, therefore, created a pool of money from which all such claims would be resolved. Every contractor and subcontractor needed to take a reduction in their asserted claim if they were to be paid from the sale closing. This was also the price the contractors needed to pay to avoid proving up the balances they asserted were owed to them. Kearney agreed to a 25.86% reduction of its asserted direct claim against Legacy. Kearney was, in fact, paid 75.14% on its direct claims and was so paid on a "no look" basis. Likewise, Okland agreed to a 23.5% reduction on the aggregate amount of all its claims and the claims asserted by its subcontractors. The actual principal amounts of any given claim were never resolved. That is the very nature of this "no look" settlement. A one-size-fits-all reduction was agreed to by Legacy and Pacific and, in return for payment at the sale closing, Okland and its subcontractors (including Kearney) were to receive the agreed upon percentage reduction of their asserted claims.

The Court finds Legacy and Pacific implicitly accepted the principal amounts of the claims asserted by all contractors, including Kearney, but the tradeoff required of these claimants was that they all needed to take at least a 23.5% claim reduction. The fact that some of Okland's subcontractors actually accepted from Okland sums less than the percentage paid to Okland does not alter the fact that Kearney did not accept such additional reductions. The Court finds Okland and all its subcontractors were to be paid 76.5% from the sale of the Sports Park unless they agreed to a lesser amount. Kearney agreed with Pacific and Legacy that it would accept 75.14% of its $3,169,965 indirect claim. Okland must pay Kearney only that 75.14% amount, i.e. $2,381,911. Since Okland has already paid Kearney $1,953,338, it now must pay Kearney $428,573. In addition to

the principal award of $428,573, the Court holds that Kearney is entitled to any pre-judgment interest actually earned on the Holdback funds from the date on which Okland received the Holdback. Moreover, from the date of entry of judgment, Kearney shall be entitled to post-judgment interest accruing at the federal rate under 28 U.S.C.A. § 1961.

### 4. Earmarking and Conduit Transfers

The lay definition of earmark is: "to designate (something, such as funds) for a specific use or owner."[150] In the bankruptcy preference avoidance context, the earmarking doctrine dictates that "where borrowed funds have been specifically earmarked by the lender for payment to a designated creditor, there is held to be no transfer of property of the debtor even if the funds pass through the debtor's hands in getting to the selected creditor."[151] The doctrine rests on the principle that the funds transferred are "neither controlled by, nor belong to, the debtor."[152] The mere fact that a debtor may have the power to divert the funds deposited in its account does not amount to having control over the disposition of said funds.[153] The funds are transferred through, not by, the debtor to the particular creditor, with the debtor simply acting as "a kind of bailee."[154]

Similarly, in fraudulent conveyance actions against an alleged initial transferee, "courts have excepted from its scope a party who acts only as a 'mere custodian, an intermediary or conduit between the bankrupt and the creditor' and who has no beneficial interest in the thing to be recovered."[155] In part, this doctrine rests on the notion that a

---

[150] *Earmark*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/earmark (last visited July 10, 2025).
[151] EARMARKING, Norton Bankr. L. & Prac. 3d Dict. of Bankr. Terms § E05 (citation omitted).
[152] *In re Kemp Pac. Fisheries, Inc.*, 16 F.3d 313, 316 (9th Cir. 1994)
[153] *In re Superior Stamp & Coin Co., Inc.*, 223 F.3d 1004, 1009 (9th Cir. 2000).
[154] *In re Lazarus*, 478 F.3d 12, 15 (1st Cir. 2007)
[155] *In re Kaiser Steel Corp.*, 110 B.R. 514, 519 (D. Colo.)(quoting *Salomon v. Nedlloyd (In re Black & Geddes, Inc.)*, 59 B.R. 873, 875 n. 4 (Bankr.S.D.N.Y.1986)), *aff'd sub nom. Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846 (10th Cir. 1990).

transferee must exercise dominion or control over the asset, rather than merely serve as possessor, holder or agent.[156] The conduit does not have the right to put the money to its own purposes, and instead, the money is in fact controlled by either the transferor or real transferee.[157]

This Court recognizes that applying the earmarking doctrine or conduit liability defense to the facts of this contested matter does not exactly fit because the Court is not faced with questions involving preferences or fraudulent transfers. However, substance trumps form. The essential nature of the funds transferred in this case is functionally identical to that of transactions the earmarking and conduit doctrines were created to protect. Legacy and Pacific approved 75.14% of Kearney's indirect principal claim amount, in effect, designating $2,381,911.70 of the $15,129,271 settlement funds to Kearney. The full $15 million entered Okland's possession by virtue of the hierarchical structure between the parties, but the portion earmarked for Kearney was always to be paid through Okland (the conduit), not by Okland. The money designated by Legacy and Pacific for Kearney, upon disbursement by Legacy and Pacific, was the sole property of Kearney. Okland, as the intermediary or conduit, only possessed the obligation to transfer the money to Kearney. Because Okland's rights were limited exclusively to holding money for transfer to Kearney, Okland never had the right to control how much would be distributed to Kearney.

5. <u>Hypotheticals Explaining the Court's Findings</u>

The Court posits a few hypotheticals by way of explaining its conclusions:

Scenario 1: If Legacy, Pacific and the Buyer agreed with Okland that Okland would be paid its claims in full and that Okland would also be paid from closing the full

---

[156] *Id* at 520.
[157] *Id*; *See In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1200 (11th Cir. 1988).

and exact amount of Kearney's stated indirect claim (i.e. $3,169,965), Okland would be duty bound to pass that entire sum on to Kearney whether or not Okland felt Kearney's billings were accurate. Okland would have no contractual, legal or other basis to take a share of the $3.1 million earmarked for Kearney. Under this scenario, Okland would be serving as nothing more than a conduit, passing money from the sale closing to the party to whom the payment must be sent. The fact that Okland was ultimately paid only 76.5% instead of 100% does not change this conduit analysis because Legacy and Pacific approved payment to Kearney of 75.14% of the principal amount of Kearney's stated indirect claim totaling $3,169,965.

Scenario 2: If Legacy, Pacific and the Buyer said to Okland "Here is $9,473,975 to pay all your subcontractors the pro rata share of amounts they each assert as the principal amount of their claims," then Okland would again be duty bound to pass along the funds earmarked for these subcontractors. Okland would have no contractual, equitable or legal basis to do otherwise. Okland could not keep some portion of the $9,473,975 just because they came into possession of those funds which were to be paid to Okland's subcontractors or because Okland disagreed with the amount Kearney claimed to be owed. This is so even if Okland did not believe Kearney had not touched all the contractual bases called for under the Subcontract Agreement or the Work Order. If Kearney's claim was acceptable to Legacy and Pacific and they handed Okland enough money to pay Kearney's claim in full, Okland must pay that money to Kearney.

Scenario 3: If Legacy, Pacific and the Buyer said to Okland, "Here is enough money to pay 75.14% to yourself and 75.14% to each of your subs in the principal amount of their stated indirect claims," could Okland unilaterally decide Okland would pay a sub's indirect claim at a lower percentage and also pay Okland itself for any other amounts otherwise directed to be paid by Okland to the subs? The Court knows of no

contractual, equitable or legal basis justifying Okland "skimming" from the amounts directed to be paid to those subcontractors.

The Court finds Okland has no legal, equitable or contractual basis for Okland to receive from closing an amount totaling 76.5% of the principal amount of Kearney's stated indirect claim and then pay Kearney anything less than the 75.14% of $3,169.965 which Kearney agreed to accept, i.e. $428,573.

## C. The Common Fund Doctrine

From the sale of the Sports Park, Okland was paid $15,129,271. This amount totaled 75.14% of the claim it asserted against Legacy and Pacific ($19,768,412).[158] The Okland claim was comprised of not only amounts Okland asserted for itself ($10,924,473) but also all the materialmen's claims asserted via their work through Okland on this project ($9,473,975). Upon receiving this 75.14% distribution, but before paying anything to the subcontractors, Okland appropriated the sum of $400,000 to cover a portion of attorneys' fees it incurred because Okland claims it spent over $600,000 on legal fees. Okland maintains that spending those attorneys' fees achieved the recovery it ultimately received from proceeds of the sale of the Sports Park. Acknowledging that it had no contractual basis for withholding this $400,000 amount Okland points to the so called "Common Fund Doctrine" as the legal basis for charging its subcontractors a portion of its legal fees expended to gain the recovery Okland, and its subcontractors collectively enjoyed.

Arizona law governs the agreements between Okland and Kearney in connection with the Sports Park.[159] Under Arizona law "[i]t is well established that a court in Arizona

---

[158] As noted above, Pacific owned the real property leased to Legacy and upon which the Sports Park was built.
[159] Paragraph 51 of the Subcontract Agreement (Ex. 1) states: "This Subcontract shall be construed and interpreted as a whole in accordance with its fair meaning and in accordance with the laws of the state of the location of the Project."

may award attorney fees only when expressly authorized by contract or statute."[160] The Arizona Division One Court of Appeals noted that the "common fund doctrine is an equitable exception . . . allowing a court to award attorneys' fees 'to counsel for the prevailing side whose efforts in litigation create or preserve a common fund from which others who have undertaken no risk or cost will nevertheless benefit.'"[161] The *Burke* court tells us that "[t]he common fund doctrine serves the twofold purpose of compensating counsel for producing benefits for a class and preventing the unjust enrichment of the class members who receive them."[162] The common fund doctrine is not a "fee shifting" concept like that found at A.R.S. § 12-341.01, but rather, spreads the cost of attorney fees among those benefited.

The U.S. Supreme Court had occasion to discuss the common fund doctrine, enunciating a three-factor test requiring that (1) the class be identifiable, (2) the benefits be accurately traceable and (3) that the fee be susceptible to accurate apportionment among the benefited class.[163] Arizona courts apply this *Alyeska* test when faced with a Common Fund claim.[164]

Applying the *Alyeska* factors to the case at bar, factor one is readily apparent but not so with factors two or three. Okland did expend significant fees and surely the efforts of Okland's attorneys aided in an ultimate recovery from the Sports Park sales proceeds. However, Kearney also incurred significant attorney's fees pursuing its own interests, as did many of Okland's other subcontractors. This Court finds the benefits achieved in this Court are not accurately traceable solely (or even largely) due to the work of Okland's

---

[160] *Burke v. Arizona State Retirement System*, 77 P.3d 444, 447 (App. 2003) citing *DVM Co. v. Stag Tobacconist, Ltd.*, 671 P.2d 907 (1983).
[161] *Burke*, 77 P.3d at 447 (citing *Kerr v. Killian*, 3 P.3d 1133, ¶ 19 (Az. App. 2000)).
[162] Burke, 77 P.3d at 448.
[163] *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240 (1975).
[164] *Kerr v. Killian*, 3 P.3d 1133, 1139 (Az. App. 2000).

counsel. It was a group effort that achieved this fund but everyone in the contractor group was working for their own interests.

The third *Alyeska* factor is also absent. Okland simply took $400,000 off the top of the recovery earmarked for Okland and the subcontractors, without regard to who was benefited in what amount or through which actions by Okland's counsel. While Okland's approach is clean in its simplicity, it was by no means an accurate apportionment of Okland's fees among those who were benefited.[165]

While this Court finds that Okland has failed to demonstrate it satisfied the two of the three *Alyeska* factors to the common fund test, there is yet another basis for this Court's conclusion. The common fund doctrine is not an equitable principle wherein one party is empowered to unilaterally extract from others who were not fortunate enough to come into possession of the funds in question. The common fund doctrine is, as the *Burke* court noted, an equitable doctrine which allows a <u>court</u> to allocate fees among the benefited class or group. This Court was not asked to permit an equitable common fund fee award to Okland. Okland simply took $400,000 from its subcontractors. A court of equity has authority to equitably award fees to a party under the common fund doctrine but one of the benefited parties does not unilaterally possess that same equitable power.

As between Okland and Kearney (but no other Okland subcontractors), this Court finds Okland has not met its burden of demonstrating that, under the common fund doctrine, it was permitted to extract a portion of its attorney's fees from amounts properly due to Kearney.

In summary, the Court finds neither Legacy nor its agent, MTI, ever rejected any of the COR's Kearney submitted on the Sports Park project. Rather, the Court finds that, having paid Okland the sum of $15,129,271, Legacy implicitly approved Kearney's

---

[165] Fisher, Okland's Director of Finance, noted at trial that Kearney was the loan subcontractor who objected to Okland making this $400,000 Common Fund assessment. While that may be true, Okland needed to satisfy the *Alyeska* factors once Kearney objected to this assessment. Okland failed to do so.

indirect claim of $3,169,965. The Court further finds that, having paid Okland the sum of $15,129,271 to satisfy the claims of Okland ($10,294,437) and its subcontractors ($9,768,412), Legacy implicitly intended that Okland pay its subcontractors no more than 76.53%.[166] Moreover, Okland was to pay its subcontractors based upon the subcontractors' stated direct claims identified on page 74 of 75 in the Sale Order[167] or such lesser amount(s) agreed to by the subcontractor. The Court finds Kearney agreed to take 75.14% of its indirect claim stated in the principal sum of $3,169,965. The Court also finds that where Legacy and Pacific agreed to pay Kearney these amounts, Okland could not withhold payment to Kearney because it had not approved Kearney's COR's in writing. In other words, Legacy approved Kearney's COR's and paid the agreed upon percentage of Kearney's COR's so Okland could not refuse to approve Kearney's claim. The conditions for payment to Kearney by Okland have been satisfied.

The Court finds Okland had no legal, equitable or contractual basis to withhold from Kearney's payments any amount to cover any portion of the attorneys' fees or costs it incurred in connection with collection of sums due it from the Sports Park project.

## V. INTEREST, ATTORNEYS' FEES AND COSTS SOUGHT BY THE PARTIES

Federal courts typically follow the American Rule, which provides that parties must bear their own attorneys' fees, absent a contract provision or statute to the contrary.[168] A court may also award attorneys' fees when another party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."[169]

---

[166] $15,129,271 ÷ $19.768,412 = 76.53%.
[167] Ex. 185.
[168] *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 257 (1975).
[169] *Chambers v. NASCO, Inc.,* 501 U.S. 32, 33 (1991)(citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–259 (1975)).

As noted above, Arizona law governs the agreements between Okland and Kearney in connection with the Sports Park. Pursuant to A.R.S. § 12-341.01, a court may award the successful party reasonable attorney fees in any contested action arising out of a contract, express or implied. The contract must be a substantive predicate to an action.[170] Courts have broad discretion to award attorneys' fees and must consider the following six factors when making its decision:

1) Whether the unsuccessful party's claim or defense was meritorious;
2) Whether the litigation could have been avoided or settled and the successful party's efforts were completely superfluous in achieving the result;
3) whether assessing fees against the unsuccessful party would cause extreme hardship;
4) whether the successful party prevailed with respect to all the relief sought;
5) whether the legal question was novel and whether such claim or defense has previously been adjudicated in this jurisdiction; and
6) whether the award would discourage other parties with tenable claims or defenses from litigating or defending legitimate contract issues for fear of incurring liability for substantial amounts of attorneys' fees.[171]

No single factor is determinative, and a court must weigh all factors when determining whether to award attorneys' fees.[172] The party making the request has the burden of proving entitlement to such an award under A.R.S. § 12-341.01.[173] However, with respect to whether fees would cause extreme hardship, the unsuccessful party has the burden of producing prima facie evidence of financial hardship.[174]

Kearney asserts it is entitled to attorneys' fees because this contested matter arises out of contract, whether it be the Subcontract Agreement, the Work Order or the MOU.[175] The money at issue was not provided by Legacy principally pursuant to the Subcontract

---

[170] *See In re Bertola*, 317 B.R. 95, 100 (B.A.P. 9th Cir. 2004) (citing *Sparks v. Republic Nat'l Life Ins.*, 132 Ariz. 529, 543, 647 P.2d 1127, 1141 (1982)).
[171] *Associated Indem. Corp. v. Warner*, 143 Ariz. 567, 694 P.2d 1181, 1184 (Ariz. 1985)
[172] *Wilcox v. Waldman*, 154 Ariz. 532, 744 P.2d 444, 450 (Ariz.App.1987)
[173] *Woerth v. City of Flagstaff*, 167 Ariz. 412, 808 P.2d 297, 304 (Ariz. Ct. App. 1990)
[174] *Sw. Cotton Co. v. Ryan*, 22 Ariz. 520, 199 P. 124, 129 (1921).
[175] DE 895, p. 26.

Agreement or the Work Order. The Holdback was created pursuant to the MOU and the Sale Order but the $500,000 were paid to Okland and Okland must pay Kearney the principal sum of $428,573 because Legacy and Pacific consented to Kearney's claim of $3,169,965 so long as it only had to pay 76.5% of that claim. While, of course, Okland and Kearney had written contracts and those contracts had attorney fee provisions, the Holdback fund was created because Legacy and Pacific agreed to Kearney's number. That was outside of the realm of the Kearney-Okland agreements. There is no contract provisions between the parties that entitles Kearney to its fees under these facts. The Court declines to grant Kearney its attorney's fees in connection with this contested matter.

Neither party addressed the *Warner* factors at trial or in their briefs, but the evidence in the record is sufficient to conclude these factors, in aggregate, weigh against awarding attorney's fees. First, Okland advanced meritorious arguments. As established above, Kearney's questionable COR's likely may have justified withholding payment under the Subcontract Agreement. Second, there is evidence indicating that this litigation could have successfully been avoided or settled but for the parties being stuck in their positions. Third, Okland did not produce evidence that assessing attorney's fees against it would cause undue hardship. Fourth, Kearney was successful with respect to most of the relief sought, but its victory was so close as to largely eliminate the weight of this factor. Fifth, while this matter did not raise any novel legal issues, the facts and circumstances of this case were complex and reasonably warranted a trial on the merits. Sixth, considering Okland advanced meritorious claims, an award of attorney's fees would likely discourage parties with similarly tenable claims from pursuing litigation. Taken together, factors one and six weigh against assessing fees against Okland, while the remaining factors do not carry countervailing weight. This Court declines to award Kearney its attorney's fees under A.R.S. § 12-341.01.

In addition, the Court does not find that Okland acted in bad faith. None of the arguments raised by Okland were frivolous or wholly unwarranted. MTI's markups on Kearney's COR's reasonably identified flaws or inconsistencies within the COR's submitted by Kearney, which may have prevented satisfaction of Kearney's conditions precedent to payment. Although Okland is not the prevailing party,[176] the merit of Okland's claims and defenses to payment made this decision a close call. As such, it cannot be said that Kearney was acting in bad faith. Again, this Court declines to award Kearney attorney's fees.

While the Court declines to award Kearney attorneys' fees, it is compelled to award Kearney its costs in pursuing this contested matter. A.R.S. § 12-341 states, "The successful party to a civil action <u>shall</u> recover from his adversary all costs expended or incurred therein unless otherwise provided by law." Accordingly, this Court awards Kearney recovery of its costs incurred with respect to this contested matter.

## VI.   FACTUAL AND LEGAL ISSUES SUBMITTED TO THE COURT BY THE PARTIES

Harkening back to the parties' Pre-Trial Statement,[177] the Court now resolves their stated factual and legal issues as follows:

**a.   Whether any of Kearney's change order requests were rejected.**

Legacy did not reject any of Kearney's COR's and, therefore, neither could Okland do so.

**b.   Whether Okland's and/or Marc Taylor's comments to Kearney's change orders qualify as rejecting the change orders.**

---

[176] For that matter, Kearney is not entirely a prevailing party either.
[177] DE 872.

Legacy and Okland posed questions concerning some of Kearney's COR's but those questions were answered by Kearney and, much later, Legacy and Pacific agreed Kearney's indirect claim was accepted but would be paid no more than 76.53%.

**c.     Whether the August 1, 2022 Settlement Term Sheet impaired or reduced Kearney's lien amount.**

It did not.

**d.     Whether the bankruptcy settlement resulted in the Debtor's and Landowner's acceptance of the face value of Kearney's lien amount, inclusive of all change orders as submitted by Kearney.**

It did and this Court approved that settlement.

**e.     Whether the bankruptcy settlement binds Kearney to the terms Okland asserts or suggests.**

Kearney is not bound to what Okland asserts as the basis for not paying Kearney what Kearney agreed to accept as a compromised payment of its full asserted indirect claim.

**f.     Whether Kearney is entitled to a 76.5% distribution on its lien under Okland.**

It is not. Kearney is only entitled to be paid 75.14% of the principal amount of its asserted indirect claim.

**g.     Whether Okland had the right to request that Kearney contribute toward Okland's legal expenses.**

It did not because Okland had not satisfied the requirements of the Common Fund Doctrine.

The parties identified their disputed material issues of law in their Joint Pre-Trial Report.[178] The Court now resolves those issues of law as follows:

---

[178] DE 872.

**a. Whether the Memorandum of Understanding binds Kearney's and/or Okland's rights with respect to sale proceeds?**

The MOU did not alter the requirement that Okland pass through to Kearney the 75.14% of Kearney's indirect claim which Pacific and Legacy agreed to pay.

**b. Whether Okland was justified in requesting that Kearney contribute toward a portion of Okland's attorney's fees?**

Okland has not satisfied the elements necessary to impose the Common Fund Doctrine upon Kearney.

**c. Whether the Memorandum of Understanding and the Debtor's and Landowner's [Pacific] agreement thereto resulted in acceptance of all of Kearney's change orders.**

Kearney's COR's have all been accepted by Legacy and Pacific but, of course, Kearney agreed to accept payment of only 75.14% of those accepted COR's.

**d. Whether the Arizona Prompt Pay Act applies and if Okland should have immediately paid Kearney on account of its lien claim without objection.**

In the final analysis, the Court finds Okland should have paid Kearney the sum of $428,573 promptly upon its receipt of $15,129,271 from the closing of the sale of the Sports Park.

**VII.  CONCLUSION**

Legacy and Pacific agreed to pay Okland $15,129,271 and, in doing so, agreed to pay 76.53% of Okland's claim of $10,294,437 and 76.53% all of Okland's subcontractors' claims totaling $9,768,412. This 76.53% payment signaled an implicit acceptance by Legacy and Pacific of all of Okland's claims and the claims of its subcontractors, including Kearney. These contractors' claims were approved but discounted by 23.5% because there were insufficient funds to pay any contractor the full

amount of their claims. Since Okland or its escrow agent are now holding $500,000 pending the resolution of this contested matter, Okland must promptly arrange to pay Kearney $428,573 plus interest earned on this amount since the Holdback was created. Kearney is also awarded its costs plus post-judgment interest on these sums at the federal rate, until paid. Both Kearney and Okland's requests for attorneys' fees are denied.

**ORDERED** Kearney is hereby directed to lodge a form of Judgment consistent with this Court's Order.

**DATED AND SIGNED ABOVE.**